577 A.2d 814

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
FRANK L. GROSS, DEFENDANT-APPELLANT.

Argued January 17, 1990—Decided July 30, 1990.

*Claudia Van Wyck,* Assistant Deputy Public Defender, argued the cause for appellant (*Thomas S. Smith, Jr.,* Acting Public Defender, attorney).

*Mark P. Stalford,* Assistant Prosecutor, argued the cause for respondent (*John Kaye,* Monmouth County Prosecutor, attorney).

*Anne M. Patterson,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey (*Robert J. del Tufo,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

HANDLER, J.

The focus of this appeal is identical to that of the companion case, *State v. A. Gross,* 121 *N.J.* 1, 577 *A.*2d 806 (1990). It involves the standards governing the admission, as substantive evidence inculpating the defendant, of an inconsistent statement made by a suspect-declarant while in police custody. Defendant, Frank L. Gross, was tried separately for two armed robberies. In each trial, the court conducted an *Evidence Rule* 8 hearing to determine the admissibility of the prior inconsistent statements of Stephen Johnson, a prosecution witness, who

in the course of his testimony had refused to incriminate defendant in the robberies. In each case, the trial court admitted into evidence the witness' prior statements, which implicated defendant in the two robberies. Defendant was convicted of armed robbery and related offenses in both cases.

The appeals from the ensuing convictions were argued together in the Appellate Division. That court remanded each case to the trial courts, which jointly conducted a hearing to determine the reliability of Johnson's prior inconsistent statements. Following the joint hearing, each trial court separately determined that the statements were reliable and properly admitted. The Appellate Division then sustained the respective convictions.

The matter comes to this Court on appeal as of right pursuant to *R.* 2:2–1(a)(2), there being a dissent in the Appellate Division with respect to the burden of proof that applies in a hearing to determine the admissibility of a witness' prior inconsistent statement.

## I.

Defendant, as noted, was tried separately for the offenses arising out of two armed robberies. The statements that Stephen Johnson had given while in custody as a criminal suspect implicated defendant in the two robberies. In the separate trials, the courts conducted an *Evidence Rule* 8 hearing to determine the admissibility of the prior inconsistent statements of Johnson, and, in each case, admitted the statements. The significance of those respective rulings can be measured only against the factual record developed in each trial.

## A.

With respect to the first robbery, the evidence disclosed that at approximately 4 a.m. on October 23, 1981, Khalil Salahud-din, manager of a Muslim pork-free sandwich shop, had closed his

store for the evening. Salahud-din reopened the store for Stephen Johnson, a regular customer. Shortly thereafter two men pushed their way into the store, knocking Johnson against Salahud-din. Salahud-din testified that the first intruder was over five-feet-ten-inches tall, carried a gun, and had been wearing a dark-brown ski-mask, grayish pants, and a sleeveless shirt. The second intruder was shorter than the first and had worn a dark, bulky coat and a dark ski-mask. While pointing a gun at the store manager, the taller man had watched the door. Meanwhile, the shorter man had attempted to empty the cash register. When the register jammed, the taller man had forced the manager to open it, and had told his companion to get the money from the back room. The intruders stole approximately $200. Salahud-din called the police, who questioned both Salahud-din and Johnson, but neither victim identified the perpetrators.

Johnson was arrested later, in December 1981, for the commission of an unrelated armed robbery. While in custody as a suspect for that crime, Johnson had given statements inculpating defendant in the Salahud-din robbery, as well as a second robbery, committed in November 1981.

The State anticipated that Johnson would be its primary witness at defendant's trial for the Salahud-din robbery. Johnson informed the prosecutor, however, that he repudiated his prior statements. The trial court then held a hearing under *Evidence Rule* 8 to determine whether Johnson could testify and whether his prior statements could be admitted into evidence under *Evidence Rule* 63(1)(a).

At the hearing, Detectives Reed and Dowling testified that on December 7, 1981, they had gone to the Monmouth County Correctional Institution to interview Johnson, who had been arrested for an unrelated armed robbery. Reed had long been a friend of Johnson's family. Johnson had a swollen face and injured ribs from a scuffle with the police at the time of his arrest. The detectives had spoken with Johnson for about

forty-five minutes. Reed admitted that he had tried to use his familiarity with Johnson's family to gain Johnson's confidence, that he had told Johnson that "cooperation is met with cooperation", that he had discussed the possible penalties Johnson faced in light of the charges pending against him, and that Johnson could be charged with the Salahud-din robbery. At the close of the discussion, Johnson had allegedly told Reed "that Frank Gross and Richard Busby were the individuals" who had committed the robbery. On the following day, December 8, Johnson gave a formal written statement recounting the events of October 23, 1981, and implicating Frank Gross in the Salahud-din robbery. Reed testified that he had informed Johnson of his rights. Reed recalled that Johnson had asked to call his family, but he could not remember whether Johnson had requested an attorney. Johnson did call his brother, who came to speak to him. Dowling's testimony essentially confirmed Reed's account.

Johnson claimed at the hearing that his statement had been coerced. He testified that during the December 7 visit, Reed had insinuated that the word on the street was that Gross and Busby "were the ones that did it." Johnson claimed that he had been taken to the Asbury Park Police Department several times to give a statement. He further alleged that he had been held overnight in a cold cell containing only a single wooden bench on which to sleep. According to Johnson, both Reed and Dowling had suggested that he should help himself as well as them. He claimed the detectives had threatened him with prosecution, telling him that they could "try and stick me with a robbery that was supposed to happen right next to Richie's," and if he identified the robbers, Reed would make sure that he was not implicated in the crime. Johnson further testified that Reed had insisted that he "was the setup man," that he had been "physically beat up," "nervous" and "paranoid;" "it is not every day I go around getting pistols stuck in my mouth, getting kicked in the ribs and being smacked in my face." According to Johnson, he had not obtained counsel because

Reed had said a lawyer was unnecessary because Reed, as a friend of the family, would help him through it. Johnson admitted, however, that he had spoken to his brother, who told him "that they want Gross bad because of several robberies," and to "go along with it."

With respect to the formal statement, Johnson admitted that he had told the detectives that defendant had been at his house immediately before and after the Salahud-din robbery. But Johnson claimed that he had not identified the perpetrators. Johnson insisted that he had signed the statement implicating defendant in the Salahud-din robbery only because he had been "trying to get the hell out of the Police Department quick and as soon as possible."

The trial court found that "the circumstances under which the statement was given were [reliable]", because the police had given defendant *Miranda* warnings; defendant had not requested an attorney; defendant had been allowed to call home; and the police had made no threats or promises to induce the statement. The court ruled that the statement would be admissible as substantive evidence pursuant to *Evidence Rule* 63(1) if Johnson recanted at trial.

When the trial continued, the State called Johnson as a witness. Johnson testified that he did not know who had committed the Salahud-din robbery. He claimed that his earlier statement was false, that he had made it in response to police coercion and pressure, and that he had simply gone along with Detective Reed's insinuation that Gross and Busby had committed the robbery. Recalled to the stand, Detective Reed reiterated his version of the events leading up to Johnson's statement. Reed then read Johnson's prior statement to the jury.

Another witness for the State, Dorothy Ramsey, who had been in the vicinity of Salahud-din's at the time and had seen defendant and Johnson, testified inconsistently. Because of the inconsistencies in Ramsey's account, Johnson's prior statement

proved to be the strongest evidence implicating defendant in the robbery.

In charging the jury, the trial court mentioned that Johnson had given the police a prior written statement that was inconsistent with the testimony heard in court. The jury found defendant guilty of armed robbery, in violation of *N.J.S.A.* 2C:15–1a, and unlawful possession of a weapon without a permit, in violation of *N.J.S.A.* 2C:39–5b.

### B.

With respect to the second robbery, the record indicates that at approximately 7:00 p.m. on November 24, 1981, a man entered Gaushin's Chinese restaurant and ordered fried rice. After placing the order, the customer, who had a sparse gray or white beard and gray or white eyebrows, pulled a gun on the manager, Mung Sing Yip, and demanded the money in the register. After taking the money, the perpetrator fled. Shortly thereafter Mung reported the incident to the police. He had been the only witness to the crime.

Officer Villapiano, who had responded to the call, testified that Mung had described the perpetrator as a black male approximately the height of the officer (five-feet-eleven-inches tall), with a white or gray beard and white or gray eyebrows, and wearing a light-colored waist-length jacket and a reddish hat. Mung recalled having described the perpetrator only as having a white or gray beard.

The State then called Johnson as a witness. Johnson's testimony in this case paralleled his testimony in the Salahud-din trial. Although he acknowledged having given Detective Reed a statement regarding the Gaushin robbery, Johnson testified that the statement was false. He recalled telling Reed only that when he had been at defendant's apartment "one day[, defendant] was making himself up." Johnson claimed that Reed had supplied the rest of the information in the statement. Johnson testified that he had signed the false statement be-

cause Detectives Reed and Dowling "kept questioning [him] about several robberies," "[his] face was still swollen from when [he] got arrested," the detectives kept "shooting verbal hints like [he had] to do this," and he was scared. He claimed that everything in the statement implicating defendant in the Gaushin robbery was a "li[e] to get out of there."

The trial court, at defense counsel's request, conducted an *Evidence Rule* 8 hearing to determine whether the circumstances under which the statement had been given were sufficiently reliable to admit it as substantive evidence pursuant to *Evidence Rule* 63(1)(a). At that hearing, Detective Reed's testimony of the events leading up to Johnson's statement was similar to the description he had given in the Salahud-din trial. He added, however, that Johnson had hesitated before giving the statement: "He never said he wasn't going to give a statement. He said a couple of times that he didn't want to. We talked to him and he changed his mind." Reed also conceded that although Johnson had stated that he had used the drugs that defendant had bought with the Gaushin-robbery money, Johnson had not been charged for receiving proceeds from an armed robbery. He denied, however, that he had agreed with Johnson to withhold charges on the basis of Johnson's statement. Dowling's testimony corroborated Reed's account.

Based on that testimony and the fact that Johnson had been given his *Miranda* rights, the trial court ruled that the statement had been given "under circumstances which would evidence its reliability" and was admissible as a prior inconsistent statement. When the trial resumed, Detective Reed read Johnson's prior inconsistent statement to the jury.

The court, in the course of its charge, instructed the jury that Johnson had given the police a prior written statement that was inconsistent with the testimony heard in court, and explained the circumstances for determining its probative worth. The jury convicted defendant of armed robbery, contrary to *N.J.*

*S.A.* 2C:15–1a, and unlawful possession of a weapon without a permit, contrary to *N.J.S.A.* 2C:39–5b.

### C.

As earlier noted, defendant's separate appeals from his convictions were heard together in the Appellate Division. The Appellate Division concluded that the *Evidence Rule* 8 findings in both the Salahud-din and Gaushin trials were incomplete and ruled that the respective trial courts should conduct jointly an additional *Evidence Rule* 8 hearing to determine the reliability of Johnson's statements under all of the relevant circumstances. It ruled further that the standards governing the determination of reliability were those set forth in its opinion in *State v. A. Gross*, 216 *N.J.Super.* 98, 523 *A.*2d 215. Those standards called for a determination of the prior inconsistent statement by a preponderance of the evidence, taking into account all relevant surrounding circumstances. *Id.* at 109–10, 523 *A.*2d 215.

Pursuant to its remand order, a hearing under *Evidence Rule* 8 was held jointly before both of the trial judges. The hearing was conducted notwithstanding Johnson's death following the trials of the defendant.

At the hearing, Reed reiterated his version of the events leading up to Johnson's statement. He indicated that before having given the two formal statements on December 8, Johnson had been kept intermittently for approximately six-and-one-half hours in a six-by-twelve cell containing a sink, water fountain, and wooden bunk, and having central heating. Reed had informed Johnson of his rights and had allowed him to speak to his mother and brother. Reed testified that he had obtained information concerning defendant's participation in several armed robberies. At the time of Johnson's arrest the police had recovered a gun fitting the description of the weapon used in the robberies. On December 7, 1981, the detectives had interviewed Johnson in the booking area of the Monmouth

County Jail. Despite his apparent physical discomfort, Johnson had been relatively cooperative. During the interview Johnson allegedly had told Reed "that the weapon was Mr. Gross' or Mr. Gross had access to the weapon...."

Although Johnson had been hesitant to give the Salahud-din statement, Reed testified that the police had not used physical force, verbal threats, or promises to induce the statements. Reed was a friend of Johnson's family. He had informed Johnson of the seriousness of his pending charges. Reed admitted that he had informed Johnson that his cooperation would be "brought to the attention of the prosecutor's office." Further, Reed had not charged Johnson, although Johnson had provided information implicating himself in both the Salahud-din and Gaushin robberies. Detective Dowling confirmed Reed's account. He added that Johnson had signed the statement and that he had taken the statement in conformity with the general procedure.

Each of the presiding judges considered Johnson's earlier testimony in reaching their respective decisions based on separate findings. The trial court in the Salahud-din robbery prosecution acknowledged that an exculpatory statement that implicates another raises "special suspicion." The court nevertheless concluded that Johnson's statement had been made under circumstances evidencing its reliability. Specifically, the court found that Johnson had been defendant's friend, had described the events from personal knowledge, had had a full day to reconsider giving a statement, had not requested an attorney, and had spoken to both his mother and brother, and that the evidence found in Gross's apartment corroborated Johnson's statement. Although noting that Johnson had been injured and that the detectives had encouraged his cooperation, the court determined that the detectives had not exerted coercive measures.

The trial court in the Gaushin robbery prosecution found that Johnson was in custody and arguably a target of the investiga-

tion when he made the statement; that even if he was not then a suspect, Johnson's participation in the robberies was a possibility; and that the detectives' initiation of the conversation may have given Johnson a motive to fabricate his statements or may have imposed implicit pressures inducing the statements. Those facts were outweighed, however, by the facts that Johnson had been a participant in the robbery and had been a long-time friend of defendant; knew both detectives, one of whom had been a family friend; although complaining of pain had not requested an attorney or doctor; had received *Miranda* warnings; had had a day to reconsider formalizing the statement; had spoken to both his mother and brother prior to having given the statement; had implicated himself in the robbery; the detective had simultaneously asked Johnson the questions and typed the responses; Johnson's incentive to make the statement could have been to place himself in a better light with the authorities; Johnson should have known the statement would be used to convict defendant; and Johnson's statement had led to the discovery of corroborating evidence. The court concluded that Johnson's statement regarding the Gaushin robbery had been made under circumstances evidencing its reliability.

Consistent with its order for remand, the Appellate Division, on receipt of the findings and conclusions of each trial court, affirmed the underlying convictions.

## II.

The Appellate Division in this case, quoting from its opinion in *State v. A. Gross*, 216 *N.J.Super.* at 109, 523 *A.*2d 215, observed that because *Evidence Rule* 63(1)(a) " 'contemplates cross-examination of the declarant, the [requisite] circumstantial showing of reliability [for admission of a prior-inconsistent statement] need not be such as would permit the statement to be admitted in the absence of the declarant.' " The court reasoned that a jury can evaluate the credibility of the witness

and determine which statement is true. The fact that Johnson was "in custody and his statement inculpated defendant is not presumptively suspect, but rather one of several circumstances to be considered by the trial judge in the admission of the statement into evidence and by the jury in reaching its determination as to its truthfulness."

We ruled in *State v. A. Gross, supra,* 121 *N.J.* 1, 577 *A.*2d 806 that a prior inconsistent statement made by a declarant-witness while in police custody as a criminal suspect can be admitted under *Evidence Rule* 63(1)(a) as substantive evidence provided its reliability has been established by a preponderance of the evidence in light of all surrounding relevant circumstances, particularly noting that the status of the witness as a criminal suspect was a highly relevant circumstance. 121 *N.J.* at 16, 577 *A.*2d 806. We reasoned that because the declarant-witness is present in court and is subject to cross-examination, that obviates any need for special or heightened requirements of admissibility. We held:

> Although cross-examination does not obviate the need to demonstrate reliability, we are satisfied that the opportunity to cross-examine eliminates the necessity to impose a stricter or different test for admissibility relating to the antecedent reliability of a suspect-declarant's prior custodial statement than for that of any other witness to a crime. We determine, as a matter of law, that no presumption of unreliability attaches to such prior inconsistent statements that requires a special or heightened burden of proof. [*Id.* at 15, 577 *A.*2d 806.]

Accordingly, we ruled that reliability may be established by a fair preponderance of the evidence, pointing out that that "does not lessen the importance of the status of the declarant-witness as a circumstance relevant to the reliability of the prior inconsistent statement." *Id.* at 16, 577 *A.*2d 806. The Court also determined that "if the statement is admitted, the jury should be instructed to consider the same kinds of factors, including the status of the witness, in assessing its credibility and probative worth ... although the jury must not be informed of the judge's finding that the statement was reliable." *Id.* at 16–17, 577 *A.*2d 806 (citation omitted).

■ We are satisfied in this case, as was the Appellate Division, that the *Evidence Rule* 8 hearings, as supplemented on remand, focused on evidence relevant to the reliability of Johnson's prior inconsistent statements, including his custodial status as a criminal suspect. Each court on remand, understanding that standard, determined by a fair preponderance of the evidence that the statements had been made under circumstances indicating sufficient reliability. They considered and weighed Johnson's physical condition, the nature of the interrogation, his understanding of his constitutional rights, his opportunity to confer with his family, his relationship with defendant, the circumstances of his own arrest, his own criminal jeopardy for the crimes charged against defendant, as well as other crimes, and, importantly, his motive to lie and to inculpate defendant and to exonerate himself. Further, the courts, consistent with *Evidence Rule* 63(1)(a), were fully mindful that defendant as a witness at trial was subject to cross-examination. We conclude therefore that the prior inconsistent statements were properly admitted.

In this case, one member of the Appellate Division panel concurred in the judgment of the majority, but would require that a jury be instructed "that it must find the out-of-court statement of the third-party to be credible, in order to use it substantively against the defendant" and that "a defendant cannot be convicted exclusively on the basis of an out-of-court statement under *Evid.R.* 63(1)(a) unless there is independent corroboration that the crime was committed and that the defendant committed it."

■ We noted in *A. Gross* that particularized instructions are important in a case in which the jury is permitted to use as substantive evidence the prior inconsistent custodial statement of a suspect-declarant. Such instructions must stress the status of the witness and focus the jury's attention on the motives of the declarant, his or her interest in the outcome of the criminal proceedings, and all of the surrounding circumstances

that would bear on the reliability and veracity of the statement. 121 *N.J.* at 17, 577 *A.*2d 806. The concerns expressed by the concurring judge with respect to the credibility of prior inconsistent statements are sufficiently addressed by such instructions and do not, in our view, require added, stricter restrictions governing the jury's deliberations involving such statements. We need not consider further in this or the companion case of *A. Gross* the extent to which independent corroboration of a prior inconsistent statement should be required. That issue is not raised in these cases, and is presented in a pending appeal, *State v. Mancine*, 241 *N.J.Super.* 166, 574 *A.*2d 525 (1990), *certif. granted,* —— *N.J.* ——, —— *A.*2d —— (1990).

We conclude that the joint *Evidence Rule* 8 hearing conducted by the trial courts in each case pursuant to the remand of the Appellate Division substantially complied with the standards we set forth herein and in *A. Gross*. The findings and conclusions of each trial court that the prior inconsistent statement was sufficiently reliable to justify its admission and substantive use as evidence are amply supported by the evidence. Finally, the evidence and jury charges at the respective trials, while not specifically molded to the guidelines expressed herein, presented to the jury the full range of facts bearing on the probative worth of the prior inconsistent statements. They adequately impelled each jury to consider the reliability of the prior inconsistent statement in terms of the witness' status as a criminal suspect in its consideration and determination of all of the evidence in the case.

### III.

Accordingly, we affirm the judgment of the Appellate Division, upholding each of the convictions.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For reversal*—None.